**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )   No. 1:11-cr-00059-RWR-1 |
| | ) |
| GREGORY SCOTT NELSON, | ) |
| Defendant. | ) |

**GOVERNMENT'S MOTION TO RECONSIDER THIS COURT'S ORDER**
**GRANTING DEFENDANT'S 28 U.S.C. § 2255 MOTION**

*COMES NOW,* the United States of America, by and through its

counsel, the United States Attorney for the District of Columbia,

and respectfully moves for reconsideration of the Court's order of

October 25, 2013, granting defendant's motion under 28 U.S.C. § 2255

to vacate his conviction.  As grounds for this motion, the United

States submits that the "as justice requires" standard warrants this

request for reconsideration of the subject Order.[1]

---

[1]    The government does not lightly undertake this request for
reconsideration, recognizing that this Court has observed in an
unrelated case:

> The Federal Rules of Criminal Procedure do not provide for
> motions to reconsider interlocutory orders in criminal cases.
> Some courts nevertheless have entertained such motions, and
> applied the "as justice requires" standard . . . .  Justice may
> require reconsideration where a court patently misunderstood
> the parties, made a decision beyond the adversarial issues
> presented, or made an error in failing to consider controlling

1

The government believes that several aspects of the October 25 Order merit reconsideration.  First, the Order reflects an overly narrow reading of United States v. Ruiz, 536 U.S. 622 (2002), and draws a distinction between impeachment material and other exculpatory evidence which the text of that opinion does not support. This reading of Ruiz, moreover, may well have stemmed from the unwarranted reliance on distinguishable pre-Ruiz decisions from other Circuits as support for the conclusion that the "balance of Circuit court precedent" supports application of the principles of Brady v. Maryland, 373 U.S. 83 (1963), to the plea context.  Second, the Order inappropriately relieves defendant of the ramifications of his actual possession of the email he claims the government withheld from him, by focusing on the reasonableness of defense counsel's "reliance" on the government's failure to produce the 1:44 p.m. email; this analysis, however, sidesteps issues relating to the effectiveness of counsel's representation which cannot be determined without an

---

decisions or data, or where a controlling or significant change in the law has occurred.

United States v. Hemingway, No. 1:10-cr-00274-RWR, Mem. Op. at 1-2 (D.D.C. Mar. 13, 2013).  The government acknowledges that there has been extensive briefing in this case, but believes that its earlier pleadings may not have clearly expressed certain points that the government believes are critical to an analysis of the issues. Because the October 25 Order also has significant implications for the conduct of other, unrelated criminal cases, the interests of justice weigh in favor of considering the arguments advanced in this motion.

evidentiary hearing. [2]   Finally, in addressing the purported "prejudice" that flowed from the government's failure to disclose the 1:44 p.m. email to defendant before entering into the plea agreement, the Order bypasses the well-recognized principles of Brady v. United States, 397 U.S. 742 (1970), and its progeny, which articulate the standard for assessing the voluntariness of a plea. [3] The substitution of the analytically distinct framework of Brady v. Maryland for the well-recognized Brady v. United States analysis was both unnecessary, and unwise, because Brady v. Maryland imposes obligations on the government that will have a broad and undesirable impact on the plea negotiation process.

Relevant Facts

At 10:20 p.m. on Wednesday, February 2, 2011, defendant renewed his membership in "Bareback," a "gay hookup Website" (Nelson's § 2255 Petition at 7).  While on that website, defendant accessed the profile of Det. Timothy Palchak, who had set up a "Bareback" profile in an

---

[2]   The government acknowledges that it opposed a hearing on defendant's Brady v. Maryland claim.  The government has consistently maintained, however, that resolution of defendant's ineffective-assistance-of-counsel (IAC) claim required an evidentiary hearing (see Ex. A).  As we explain more fully infra, the Court's analysis of the Brady v. Maryland claim implicitly resolved the ineffective-assistance allegations, and this could not properly be accomplished without a hearing.

[3]   To avoid confusion, the government refers throughout this pleading to Brady v. Maryland and Brady v. United States by their full captions.

undercover capacity using the name "DCPed" (id. at 13).  Defendant engaged in a conversation with Det. Palchak about having "wild" sex, including a *ménage a trois* with a 12-year-old boy, maybe while "partying," a coded reference to the use of methamphetamine (id. at 14-16).

During that conversation, defendant asked to see pictures of the boy Palchak had described (Petition at 16).  At 1:30 p.m. (before receiving the "missing" 1:44 p.m. email that is the basis of defendant's § 2255 motion), defendant agreed to come into the District of Columbia to meet Det. Palchak (id. at 17).  Immediately after his arrival in the District, defendant was arrested (id. at 20).  The day after defendant's arrest, February 4, 2011, the government filed a criminal complaint against defendant charging a violation of 18 U.S.C. § 2422(b), an offense that carried a ten-year mandatory-minimum sentence (id. at 21).  At presentment, the prosecutor supplied defense counsel with some 25 pages of documents including the e-mail exchanges, arrest paperwork, and photographs (id.).

Over the course of the next two days, February 5 and 6, 2011, defendant met with his counsel at the jail (Petition at 21).  Defendant contends that he shared with counsel:

1)  that defendant was a recovering methamphetamine addict, and had communicated with Det. Palchak in an effort to obtain the drug;

2)  information about the "Party and Play" culture;

4

3)  that defendant had been communicating with various other people through various websites, in addition to "DCPed," in an effort to obtain methamphetamine; and

4)  the usernames and passwords for defendant's Gmail account and the adult websites he had visited in his quest for the drug. (Id. at 21-22.)

On February 8, 2011, the government gave defense counsel (via email) a second packet of papers showing the correspondence between Det. Palchak and the defendant, which the prosecutor had assembled in a way to make it easier for defense counsel to use the documents, by numbering the pages and putting the individual communications in chronological order (Petition at 22-23).  At the preliminary and detention hearing on the following day, Det. Palchak identified Government's Exhibit 3 as a "fair and accurate depiction of the recorded e-mail chat" between him and defendant (Tr. 02/09/11 at 11). At the conclusion of the hearing, the court found probable cause and ordered defendant held without bond pending indictment and trial.

By the end of February – less than a month after his arrest – defendant had negotiated a pre-indictment plea agreement with the government (Petition at 27-28).  That agreement permitted defendant to plead to a violation of 18 U.S.C. § 2423(b), which avoided the ten-year mandatory-minimum sentence accompanying § 2422(b); the agreement also provided for a three-level decrease in the otherwise

applicable Sentencing Guidelines offense level for a timely acceptance of responsibility (id. at 28). Defendant entered his guilty plea to one count of violating 18 U.S.C. § 2423(b) on April 11, 2011 (id. at 29). In connection with the guilty plea, defendant specifically acknowledged that, at the time he had traveled into the District of Columbia from Virginia, he had the intent to have sex with the 12-year-old boy whom he had discussed with Det. Palchak in their electronic communications (Plea Transcript at 16).

I.   The October 25 Order Reflects an Overly Narrow Reading of Ruiz and the Reliance on Pre-Ruiz Cases to Determine the Reach of the Supreme Court's Decision is Misplaced.

In the October 25, 2013 Order, the Court concluded that "the balance of circuit precedent" and "the purpose of Brady [v. Maryland]" warranted application of Brady v. Maryland analysis to determine the voluntariness of defendant's plea (Order at 12). The government submits that this conclusion is both inconsistent with the Supreme Court's analysis in Ruiz, which declined to impose on the government a pre-plea obligation under Brady v. Maryland to provide a defendant with "impeachment" material that might be employed in his defense; and unsupported by the law, because the "balance of circuit precedent" post-Ruiz weighs against an extension of Brady v. Maryland doctrine to the plea context.[4/]

_____

[4/]   The Court read the government's prior pleadings as suggesting that it is "unclear whether a defendant who makes out a Brady violation

6

In _Ruiz_, the Supreme Court considered whether federal prosecutors are required under _Brady v. Maryland_ to disclose impeachment information relating to potential witnesses before entering into a plea agreement with a criminal defendant. The Supreme Court found that no such obligation exists. _Ruiz_, 536 U.S. at 628. The Supreme Court observed, on the other hand, that the plea agreement at issue in _Ruiz_ obligated the government to disclose evidence of a defendant's "factual innocence," which minimized the concern that "innocent individuals, accused of crimes, will plead guilty." _Id._ at 631.

In analyzing _Ruiz_, this Court made two observations that supported the faulty conclusion that the purposes underlying the _Brady v. Maryland_ doctrine warrant application of that doctrine to the plea context. First, the Court noted that it was important to the Supreme Court's holding in _Ruiz_ that the plea agreement imposed on the government an obligation to disclose evidence establishing "a defendant's innocence," which this Court interpreted as a signal that the Supreme Court "would hold that a defendant has a constitutional right to exculpatory evidence at the guilty plea stage" (Order at 8).[5] Second, focusing on language in _Ruiz_, 536 U.S. at 630,

---

may withdraw his guilty plea" (Order at 6). Any such suggestion was unintentional.

[5] In fact, the provision which prompted the Supreme Court's

indicating that "the degree of help that impeachment information can provide will depend upon the defendant's own independent knowledge of the prosecution's case," this Court suggested that there is a significant difference between impeachment evidence and "exculpatory" evidence, because the latter "derives its value independent of the defendant's knowledge of the prosecution's case. Evidence tending to show that a defendant is not guilty undermines proof of the essential elements of the crime, regardless of what the defendant knows of the prosecution's case" (id. at 7 n. 3). The government submits that both of the Court's observations are actually in conflict with the analysis set forth in Ruiz.

---

confidence in the fairness of the plea did not require disclosure of any evidence of "a defendant's innocence," but only evidence which demonstrated "factual innocence." Evidence establishing a defendant's "factual innocence" is distinguishable from, and decidedly narrower than, many types of "exculpatory" information that a defendant might draw upon in formulating a defense. Compare Bousley v. United States, 523 U.S. 614, 623-624 (1998) (equating "factual innocence" with "actual innocence" and concluding that to establish "actual innocence," a defendant "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.")(internal quotations and citations omitted) with United States v. Johnson, 592 F.3d 164, 170-171 (D.C. Cir. 2010) (in Brady v. Maryland analysis, a "probability" reaches the level of "reasonable" when it is high enough to "undermine confidence in the verdict," but court does not have to be convinced that it is "more likely than not that the defendant would have been acquitted had the evidence been disclosed")(internal quotations and citations omitted).

8

Although the plea agreement at issue in Ruiz required the government to disclose to the defendant any evidence "establishing the factual innocence of the defendant," it also required that the defendant waive her right to receive "information supporting any affirmative defense" the defendant might have raised at trial.  Ruiz, 536 U.S. at 625 (emphasis supplied). [6/]  Certainly, information "supporting any affirmative defense" is exculpatory information, although such evidence will often fall short of proving factual innocence.

Significantly, the Supreme Court did not believe that the Constitution required the government to provide information about affirmative defenses to the defendant prior to plea bargaining "for most (though not all) of the reasons" that supported its conclusion that the government had no obligation to disclose impeachment evidence.  Ruiz, 536 U.S. at 633.  In particular, the Supreme Court explained that the defendant's need for information relating to affirmative defenses "is more closely related to the *fairness* of a trial than to the *voluntariness* of the plea."  Id. (emphasis in original).  Moreover, the value of such information to a defendant "in terms of the defendant's added awareness of relevant circumstances" pertinent to the decision to plead guilty is ordinarily

---

[6/]    Defendant Ruiz refused to assent to these terms and pleaded guilty without benefit of any agreement.

limited.  Id.  However, "the added burden imposed upon the Government by requiring its provision well in advance of trial (often before trial preparation begins) can be serious, thereby significantly interfering with the administration of the plea-bargaining process." Id.

The Supreme Court's treatment of affirmative defenses is informative to understanding the reach of Ruiz.  Significantly, this aspect of the Supreme Court's analysis belies this Court's observation that Ruiz drew a distinction between impeachment and all forms of "exculpatory" evidence; and that impeachment evidence can be distinguished from exculpatory evidence because the latter "derives its value independent of the defendant's knowledge of the prosecution's case."  Indeed, such a distinction would conflict with Brady v. Maryland jurisprudence, which in the trial context treats impeachment and exculpatory information alike.  See United States v. Bagley, 473 U.S. 667, 676 (1985) (noting that in the context of the government's disclosure obligations, Supreme Court "has rejected any . . . distinction between impeachment evidence and exculpatory evidence"); see also Giglio v. United States, 405 U.S. 150, 154 (1972).  The Court therefore misconstrued Ruiz, and to the extent the Court's ruling reflected that misunderstanding, the Court should

10

reconsider its October 25 Order.[7]

This Court's Order also ignored the concern, expressed in Ruiz, that imposition on the government of a Constitutional obligation to provide impeachment information during plea bargaining would have a serious and adverse effect on the plea process, causing the government and the judicial system to expend "substantially more resources to trial preparation prior to plea bargaining, thereby depriving the plea-bargaining process of its main resource-saving

_____

[7] The undisclosed 1:44 p.m. email does not amount to proof of "factual innocence" as commonly understood, or as the Supreme Court has narrowly used that term. See Sawyer v. Whitley, 505 U.S. 333, 340-41 (1992) ("A prototypical claim of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of the crime. . . . [I]n rare instances it may turn out later, for example, that another person has credibly confessed to the crime, and it is evident that the law has made a mistake."); see also United States v. Mikalajunas, 186 F.3d 490, 494 (4th Cir. 1999) (to establish actual innocence, a defendant "must demonstrate actual factual innocence of the offense of conviction; i.e., that petitioner did not commit the crime of which he was convicted; the standard is not satisfied by showing that petitioner is legally, but not factually, innocent.").

As we explain more fully infra., n.27 and accompanying text, proof that defendant was a methamphetamine addict looking to obtain the drug does not preclude a companion finding that he was also interested in a sexual encounter with the twelve-year-old boy Det. Palchak had described to him. Indeed, in the context of the "PnP" culture, proof of defendant's drug addiction may well have strengthened the government's case as to the sexual offense. In any event, any question as to defendant's intent was resolved at the time his plea was taken, when he affirmed in open court and under oath that he traveled into the District of Columbia with the intent to have sex with a minor. His admission in this regard underscores that this is not a case of "factual innocence."

advantages." Ruiz, 536 U.S. at 632.[8/]  This concern applies with equal force to an obligation to disclose other forms of exculpatory information, falling short of proof of factual innocence; such evidence can take many forms, and the government will not necessarily recognize the importance to the defendant of particular items of information developed in the early stages of a criminal case, particularly where the defendant signals his early intention to admit his guilt of the offense.[9/]  These important considerations weigh in favor of reading Ruiz broadly, to protect the viability of the plea-bargaining process.[10/]

---

[8/]   In Missouri v. Frye, 132 S. Ct. 1399, 1407 (2012), the Supreme Court cited to studies indicating that 97% of federal convictions and 94% of state convictions are obtained by way of guilty pleas.

[9/]   The impact of the application of a Brady v. Maryland disclosure obligation on the government in the plea context would be particularly onerous in cases involving large-scale investigations employing search warrants and other investigative tools, and which often result in the collection of millions of pages of documents any of which might contain potential evidentiary material.  The government would be required to cull through all of this material before it could confidently enter into a plea agreement, which would thus undermine the government's ability to offer early pleas, and in particular, pre-indictment pleas, in such cases.

[10/]   Plea bargains, of course, are as valuable to defendants as they are to the government.  Most importantly, there are decided sentencing advantages for defendants who enter pleas – particularly early (preindictment) pleas.  See United States Sentencing Guideline ("U.S.S.G.") § 3E1.1, "Acceptance of Responsibility" (authorizing a two-level reduction when a "defendant clearly demonstrates acceptance of responsibility for his offense"); U.S.S.G. § 3E1.1(b) (authorizing an additional one-level reduction in an offense level when defendant timely notifies the government of his intention to

Additionally, in its Memorandum Opinion, this Court noted that "the majority of circuits to have considered the issue have held that a Brady [v. Maryland] violation can justify allowing a defendant to withdraw a guilty plea."  The Court then cited a number of cases that were decided before Ruiz.  See, e.g., United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998); Sanchez v. United States, 50 F.3d 1448, 1453 (9th Cir. 1995); White v. United States, 858 F.2d 416, 422 (8th Cir. 1988); Campbell v. Marshall, 769 F.2d 314, 322-24 (6th Cir. 1985).[11/]  These cases are of no assistance in interpreting Ruiz

---

plead guilty and thereby permits the government to avoid trial preparation).  As the Supreme Court explained in Blackledge v. Allison, 431 U.S. 63, 71 (1977):

> Whatever might be the situation in an ideal world, the fact is that the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned. The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case, the chance to acknowledge his guilt, and a prompt start in realizing whatever potential there may be for rehabilitation. Judges and prosecutors conserve vital and scarce resources.

[11/]  Only one of the cases cited by the Court as authority for this proposition, United States v. Ohiri, 133 F. Appx 555, 562 (10th Cir. 2005), was a criminal case decided after Ruiz.  The court in Ohiri held that Ruiz is no bar to a dictate that the government must disclose "exculpatory" – as opposed to impeachment – Brady evidence pre-guilty plea.  Notably, Ohiri did not involve an early stage plea, a factor which the Court cited as an important distinguishing factor from Ruiz. McCann v. Manglialardi, 337 F.3d 782, 788 (7th Cir. 2003), a civil case, was also decided after Ruiz; but the court in Mangliardi did not resolve whether a defendant can employ a Brady v. Maryland violation to establish the involuntariness of a plea.

because the authors of those opinions had no access to the Supreme Court's reasoning.  Moreover, it is not entirely clear that the rationale of these cases supports application of <u>Brady v. Maryland</u> with full force in the plea context.

For example, the oldest of the cases cited by the Court, <u>Campbell</u>, 769 F.2d at 316, hardly presents a clear <u>Brady v. Maryland</u> analysis. <u>Campbell</u> addressed a situation where the government failed to disclose pre-plea exculpatory information that would have supported the defendant's claim of self-defense.[12/]  The <u>Campbell</u> court observed that <u>Tollet v. Henderson</u>, 411 U.S. 258 (1973),[13/] and the <u>Brady v. United States</u> "trilogy"[14/] "did not intend to insulate all misconduct

---

[12/]  Campbell was charged with murdering his former wife and her companion, Franket, after encountering them in the former wife's home. Campbell claimed that he acted in self-defense, after having been told that Franket had a gun and was "looking" for him, and when he encountered Franket, saw him reach into his pocket.  Campbell admitted to the police, however, that he did not see actually Franket with a gun.  Before pleading guilty, Campbell made a specific written request for discovery, and included a request for evidence material to his guilt or punishment.  The government did not disclose, however, that a pistol had been found on Franket's body, and that it was in the left-rear hip pocket of Franket's pants.  <u>Campbell</u>, 769 F.2d at 315-16.

[13/]  As the Court acknowledged in the October 25 Order, <u>Tollet</u> holds for the proposition that a defendant who has pleaded guilty cannot later complain about the deprivation of Constitutional rights that occurred prior to the entry of the plea (Order at 6).

[14/]  <u>Brady v. United States</u>, 397 U.S. 742; <u>McMann v. Richardson</u>, 397 U.S. 759 (1970); and <u>Parker v. North Carolina</u>, 397 U.S. 790 (1970). These cases established that where a guilty plea is otherwise

of constitutional proportions from judicial scrutiny solely because that misconduct was followed by a plea which otherwise passes constitutional muster as knowing and intelligent." Campbell, 769 F.2d at 316.  On the other hand, however, the Campbell court acknowledged that "there is no authority within our knowledge holding that suppression of Brady [v. Maryland] material prior to trial amounts to a deprivation of due process." Campbell, 769 F.2d at 322 (emphasis in original).  The court nevertheless determined, first, whether the government would have been required by Brady v. Maryland to disclose the withheld evidence at trial, id. at 318; upon concluding that such a disclosure obligation would have existed, the court examined the impact of the government's "misconduct" by applying an analysis adopted from Brady v. United States, and focused on the voluntariness of the plea "in light of all the attendant circumstances." Campbell, 769 F.2d at 323.[15]

---

voluntary and intelligently made, with the advice of counsel and on the basis of a factual proffer that establishes guilt, the plea is not rendered involuntary, even though the defendant might have been motivated to enter the plea by a statute, or in relation to state action, later found to be unconstitutional.  See discussion in Campbell, 769 F.2d at 319-321.

[15]  Those attendant circumstances included the assistance of counsel at the plea proceeding, a proper plea colloquy, and the existence of a factual basis for the plea, which together "go a long way toward protecting the plea-taking event from later collateral attack." Campbell, 769 F.2d at 324.

    Notably, the Campbell court observed:

15

Although three years later, in White, 858 F.2d at 422, the Eighth Circuit read Campbell to hold that a defendant may collaterally attack a guilty plea on the basis of a claimed Brady v. Maryland violation, the White court also focused on the competence of counsel's advice, the propriety of the plea colloquy, and the factual basis for the plea as the appropriate "analytical framework." White, 828 F.2d at 422. White involved the non-disclosure of information that the defendant could have used to attack the credibility of the key witness against him as to an element of the offense; it was thus a form of impeachment material, and the court concluded that the lack of

> Finally, it is clear that the undisclosed information's greatest value to Campbell and his counsel was an aid in their evaluation of the possibilities of success on trial and that the suppressed information was unavailable for that purpose. Yet, a plea decision is not made with any perfect knowledge of the results were a trial to be held. Both Campbell and his attorney had to know that if they had proceeded to trial, any number of events might have intervened to affect the final outcome . . . Certainly the knowledge of the gun's presence was important to Campbell and his attorney, but we cannot say it would have been controlling in the decision whether to plead. Especially given Campbell's own statements at the time of the plea, the constitutional wrong, if such it was, did not compromise either the truth or the voluntary and knowing nature of the plea.

Campbell, 769 F.2d at 324. Application of this analysis to the facts of defendant's case would compel the denial of defendant's motion to withdraw his plea, rather than support the Court's decision to grant that motion.

16

knowledge of that information had not affected the defendant's decision to forego a trial.[16/]   White is not particularly helpful in predicting whether the Supreme Court would expand its holding in Ruiz to undisclosed exculpatory evidence.

Another case cited by the court, Avellino, 136 F.3d at 255, applied Brady v. Maryland in the plea context, but also involved the government's nondisclosure of impeachment information; it is thus flatly inconsistent with the holding of Ruiz, and thus serves as dubious authority for an interpretation of the limitations of Ruiz. In addition, this aspect of Avellino has been called into doubt by a post-Ruiz Second Circuit case.  See Friedman v. Rehal, 618 F.3d 142, 154 (2d Cir. 2010) (noting that although Ruiz did not expressly abrogate the holding in Avellino, the Supreme Court has "consistently treated exculpatory and impeachment evidence in the same way for the purpose of defining the obligation of a prosecutor to provide Brady[v. Maryland] material prior to trial").

---

[16/]   In deciding that the undisclosed information would not have affected White's decision to forego a trial, the court relied on two key factors:  first, that even without the withheld information, White knew that the witness's credibility could be easily attacked in other ways, but indicated at the plea hearing that he "would not want to risk a jury verdict based on" the witness's anticipated testimony; and second, there was a substantial benefit to White in pleading guilty, in that numerous state charges would be dismissed and federal charges abandoned.  White, 858 F.2d at 424.

Finally, in Sanchez, 50 F.3d at 1453-54, the Ninth Circuit found that the government had a duty under Brady v. Maryland to disclose exculpatory material before entering into a plea agreement, but held that the evidence at issue in that case was not material to the defendant's decision to forego a trial.[17/]

By contrast to these pre-Ruiz decisions, the weight of authority post-Ruiz supports application of the Supreme Court's analysis to exculpatory as well as impeachment evidence. For example, in United States v. Conroy, 567 F.3d 174, 179 (5th Cir. 2009), the court stated that "[defendant] argues that the limitation of the [Ruiz] Court's discussion to impeachment evidence implies that exculpatory evidence is different and must be turned over before entry of a plea. Ruiz never makes such a distinction nor can this proposition be implied from its discussion." Accordingly, the defendant was precluded from claiming that the government's failure to disclose a report in advance of entering into the plea agreement was a Brady v. Maryland violation that made the plea unknowing or involuntary. See also United States v. Moussaoui, 591 F.3d 263, 285-86 (4th Cir. 2010) (re-affirming that "the Brady[v. Maryland] right . . . is a trial right"); United States v. Mathur, 624 F.3d 498, 507 (1st Cir. 2010) ("It is . . . universally acknowledged that the right memorialized in Brady [v. Maryland] is

---

[17/]   The materiality standard employed by the court in Sanchez is discussed infra.

a trial right."); <u>Lee v. Lucas,</u> No. 1:10 cv 00151, Slip Copy at 14 (N.D. Ohio Oct. 15, 2013), 2013 WL 5670930 ("Further, courts generally do not distinguish between impeachment information and exculpatory information for *Brady* purposes."); <u>Byrd v. Scutt</u>, No. 10–11823, Slip Copy, (E.D. Mich. Sep. 24, 2013), 2013 WL 5348703 (observing that although the Supreme Court did not consider in <u>Ruiz</u> whether its holding also applied to the nondisclosure of exculpatory substantive evidence prior to the entry of a guilty plea, the Court's analysis suggested that the holding extends to exculpatory substantive evidence as well); <u>Carter</u> v. <u>Hobbs</u>, No. 5:10CV00346 JMM/JTR, Slip Copy (E.D. Ark. Mar. 25, 2013), 2013 WL 1668988 ("Petitioner attempts to distinguish the Court's decision in <u>Ruiz</u> . . . . Contrary to Petitioner's argument, numerous courts have concluded that there is no federal constitutional right to the disclosure of <u>Brady[v. Maryland]</u> information prior to the entry of a guilty plea, regardless of whether it is exculpatory evidence, as opposed to impeachment evidence.")

Ultimately, the <u>Brady v. Maryland</u> doctrine is meant to ensure confidence in the outcome of a trial, that is, that a fact-finder has rendered an accurate verdict. <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 104 (1976) (fair analysis of <u>Brady v. Maryland</u> indicates that implicit in the materiality requirement is a concern that suppressed evidence might have affected the trial's outcome); <u>see also</u> <u>Moussaoui</u>, 591 F.3d at 285 (<u>Brady v. Maryland</u> exists to preserve

19

the fairness of trial verdict and to minimize chance that innocent person would be found guilty); United States v. Josleyn, 206 F.3d 144, 153 (1st Cir. 2000) (when government has exculpatory evidence and fails to disclose it, it offends trial's truth-finding function and society's notion of fair trial, as well as special role played by American prosecutors in the search for truth in criminal trials). And yet, as the Supreme Court noted, the Constitution does not require that a defendant have complete knowledge of all relevant circumstances before entering a plea, "but permits a court to accept a guilty plea . . . despite various forms of misapprehension under which a defendant might labor." Ruiz, 536 U.S. at 630.  This is because in a guilty plea situation (and particularly where a pre-indictment plea agreement has been negotiated), the defendant's own admission of guilt serves as the basis for believing that the proceeding has reached a just result. See Campbell, 769 F.2d at 322 ("admissions of factual guilt in open court are entitled to great weight"); Jones v. Bryant, 27 Fed.Appx. 699, 701 (7th Cir. 2001) (because Brady v. Maryland promotes accurate truth-finding at trial, defendant who *admits* guilt does not avail himself of those rights).

For all of these reasons, there is no basis to conclude that the Supreme Court anticipated in Ruiz the expansion of the Brady v. Maryland doctrine to require the government to disclose exculpatory evidence, falling short of proof of factual innocence, before

negotiating a guilty plea.  The Court's ruling to the contrary should be reconsidered, and defendant's petition to vacate his conviction should be denied.

II.  The Court's Analysis of the Suppression Issue Relieved Defendant of His Actual Knowledge by Employing the Wrong Test and Resolving a Disputed Fact Without an Evidentiary Basis.

There is a distinction between situations in which information known to the government but not the defense could have been discovered in the exercise of "due diligence," and situations where the defendant actually possessed the non-disclosed information. Compare United States v. Tavera, 719 F.3d 705, (6th Cir.  2013) (since Supreme Court decided Brady v. Maryland and Agurs, circuit decisions have added a "gloss" to Brady v. Maryland doctrine indicating that government cannot not err in complying with its Brady v. Maryland duties when defense counsel could have found such evidence with due diligence) (Clay, J., dissenting); with United States v. Derr, 301 U.S. App. D.C. 60, 65, 990 F.2d 1330, 1335 (D.C. Cir. 1993) ("Brady[v. Maryland] provides no refuge to defendants who have knowledge of the government's possession of possibly exculpatory information, but sit on their hands until after a guilty verdict is returned.").  The very email that is the lynchpin of defendant's Brady v. Maryland claim was at all relevant times in defendant's very own email inbox (Petition at 25 n. 15).  Defendant has acknowledged that he read it at the time it was sent to him (Affidavit ¶ 7); indeed, it was this particular

email, he claims, that prompted him to travel into the District of Columbia to meet Det. Palchak (Petition at 35-36). He therefore indisputably knew of its existence. The Brady v. Maryland doctrine simply does not apply in this circumstance. See Derr, 990 F.2d at 1335; United States v. Clarke, 767 F. Supp. 2d 12, 52 (D.D.C. 2011) ("[I]f the defendant knows of the specific exculpatory information, Brady[v. Maryland] does not require disclosure."); United States v. Zagari, 111 F.3d 307, 320 (2d Cir.) ("Brady[v. Maryland] cannot be violated if the defendants had actual knowledge of the relevant information") cert. denied, 522 U.S. 983 (1997).[18]

Ignoring this clear principle, the Court nevertheless found that the government "cannot claim its Brady[v. Maryland] obligation had been discharged since [defendant] did not know that the government had the 1:44 p.m. e-mail" (Order at 18)(emphasis supplied). The Court cited no authority in support of this proposition, and the government

---

[18] Although the government has previously cited to cases that observe that the government "has no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence," see Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997) (emphasis supplied), the government never meant to suggest that this is a "due diligence" case. The heart of the government's "suppression" argument has always been the fact that defendant himself received the email, read the email, and kept the email. At all relevant times, the exculpatory information of which defendant claims he was deprived was in the defendant's actual possession -- in his own e-mail account in-box -- a place from which he eventually retrieved it to initiate this litigation.

is aware of none.  Indeed, this aspect of the Court's Order turns Brady v. Maryland analysis on its head, because the Brady v. Maryland doctrine has nothing to do with the defendant's knowledge of the government's case;[19] the doctrine ensures only that the defendant is made aware of information that helps his own case. The defendant cannot deny that he himself knew of the e-mail, and it is simply irrelevant whether he realized that the government possessed that information as well.  In the government's view, the fact of defendant's actual knowledge and possession of the email ends the Brady v. Maryland inquiry.

In the Court's view, however, it was "reasonable" for defendant and his counsel to rely on the government's representation, "and not conduct further investigation to discover any undisclosed communications" (Order at 20).  In this regard, it is important to recall that defendant has presented as twin claims in this litigation the allegation that the government violated Brady v. Maryland by not disclosing the 1:44 p.m. email, and that his counsel was ineffective for not discovering the 1:44 p.m. email when urged, by defendant,

---

[19]/   Indeed, as the Supreme Court observed in Ruiz, 536 U.S. at 630, the Constitution does not require prosecutors to disclose to the defendant information about the government's potential case.  See also id. at 628 ("the Constitution does not require the prosecutor to share all useful information with the defendant")(citing Weatherford v. Bursey, 429 U.S. 545, 559 (1977)("There is no general constitutional right to discovery in a criminal case.")).

to examine defendant's computer and email correspondence.  Defendant
has consistently conflated the twin claims into one undifferentiated
mass.   Properly  separated,  however,  the  question  of  the
"reasonableness" of defendant's and his counsel's reliance on the
government's "discovery" production is a question that sounds in
ineffective-assistance analysis, rather than <u>Brady v. Maryland</u>
analysis.  Moreover, even if it were appropriate to conflate these
two principles to resolve defendant's overarching claim, those
aspects of the claim that turn on the credibility of defendant's
assertions or the "reasonableness" of his or his attorney's conduct
are not capable of resolution on the existing record.[20/]

Nevertheless, the Court appears to have accepted at face value
defendant's self-serving claims that he did not remember the content
of the 1:44 p.m. email before entering his guilty plea, because he
had been communicating with a number of other people at the same time
as his chat with Det. Palchak (Order at 16); that he was unable to
"pinpoint" "the exact time" when Det. Palchak confirmed that he had
methamphetamine, or produce any emails to his counsel to investigate
that point, because defendant was incarcerated (<u>id.</u>); and that he

---

[20/]   As we acknowledged <u>supra</u>, the government resisted an evidentiary
hearing on the <u>Brady</u> issue, believing that claim capable of resolution
"as a matter of law" (see Ex. A, at 2).  On the other hand, the
government has always believed that the ineffective-assistance claims
warranted an evidentiary hearing (<u>id.</u>).

"later" came to "believe" that "there were no other emails, or that any other e-mails corroborating his claim that he was merely seeking methamphetamine had been deleted" (Order at 17).[21/]  The veracity of these claims, however, is suspect.  Notably, the 1:44 p.m. email was not just one insignificant communication among many; defendant averred, in his affidavit, that he was "excited by [Det. Palchak's] comment that he was, like me, looking to score meth, and that he had a meth supplier who could sell us some meth" (Affidavit ¶ 14).  It is the government's position that there is an inherent tension between defendant's claim that the 1:44 p.m. email was central to his decision to come into the District to meet Det. Palchak, and his claim that he promptly forgot about the email when, the day after his arrest, he met with his attorneys and (presumably) reviewed the documents the government had provided at presentment; or just 5 days later at the preliminary hearing, received another packet of information from the government that did not contain that email.

Similarly, defendant attests (Affidavit ¶ 18) that he told his counsel that he had "been communicating with about 15 other people

_____

[21/]   Notably, defendant does not attest to this matter in his affidavit.  Indeed, other than asserting that he invited counsel to check his computer, gave them his usernames and passwords, and informed them that he had communicated with about 15 other people that day in his quest for methamphetamine, defendant does not explain at all in his affidavit why it is he failed to notice that the email that supposedly prompted his trip into the District of Columbia was not among the materials the government provided to him.

through various websites on the day of [his] arrest in addition to
Detective Palchak," and "used the same lines in [his] emails over
and over again by cutting and pasting them from one chat to another,"
and that he provided counsel with the usernames and passwords to all
of the online accounts he had been using on the night before his arrest.
Defendant then chastises counsel for failing to conduct any
investigation of the claim that he traveled to meet Det. Palchak solely
for the purpose of obtaining methamphetamine (Petition at 27).  In
particular, defendant criticizes counsel's failure to preserve "the
communications from Mr. Nelson's adult website accounts, despite
having access to those accounts," or "any of the emails establishing
that Mr. Nelson was seeking methamphetamine from numerous individuals
[on] the day of his arrest " (id.) (emphasis supplied).  Proof that
defendant was actively seeking methamphetamine from multiple sources
would have been important to convincing a jury that defendant's
account of his interpretation of the conversation with Det. Palchak
was not merely a self-serving, post-hoc reinterpretation of the
evidence, but truly reflected a drug addict's mania to obtain
methamphetamine from any source.  The government's failure to
disclose the full content of defendant's conversation with Det.
Palchak cannot account for counsel's failure to access defendant's
email inbox and adult website accounts in order to locate and preserve
the wealth of other information supporting a potential

26

methamphetamine-addict defense about which defendant had informed his attorneys.   Thus, a finding that counsel "reasonably" relied on the government's document production in foregoing a more thorough factual investigation lacks an adequate factual basis.[22/]   To the extent that the Court excused defendant's actual knowledge of the 1:44 p.m. email on the basis of this suspect finding, the Court's order should be reconsidered.

III. An Assessment of the Impact of the Nondisclosure of the 1:44 p.m. Email on the Voluntariness of Defendant's Plea Requires Consideration of All of the Circumstances Attendant Upon the Plea.

In assessing the prejudice to defendant that flowed from the government's failure to provide defendant with a copy of the 1:44 p.m. email before entering into the guilty plea, this Court looked to the standard applicable to Brady v. Maryland cases; i.e., whether there was a reasonable probability that "the result of the proceeding would have been different" had the evidence been disclosed (Order at 21).   This was the wrong analysis.   Defendant has challenged in this proceeding the voluntariness of his plea, and the proper standard

---

[22/]   One possible reason why counsel did not access defendant's email account is that defendant never asked them to, and his claim otherwise in this proceeding is untruthful.   It is also possible that counsel discussed the methamphetamine-addict defense with defendant, but decided for other reasons that the defense might not be viable; i.e., due to a lack of any evidence that defendant had an active addiction at the time of the offense (see Government's Supplemental Memorandum, at 9, ¶ 9); or because the defense might have the unintended effect of corroborating the government's case.   See discussion infra.

for analyzing voluntariness of a guilty plea is that established by
Brady v. United States.  See Ferrara v. United States, 456 F.3d 278,
289(1st Cir. 2006)(holding that Brady v. United States provided
sufficient framework for resolving defendant's claim that plea was
involuntary because government violated due process rights by
withholding exculpatory evidence; declining to resolve question of
whether defendant had Brady v. Maryland right to receive exculpatory
information before pleading guilty).

There are two significant differences between the Brady v. United
States and Brady v. Maryland lines of cases.  First, to prevail on
a due process claim under Brady v. United States, a defendant must
show "that some egregiously impermissible conduct . . . antedated
the entry of his plea." Ferrara, 456 F.3d at 290.[23/]  By contrast,
Brady v. Maryland applies even to non-disclosures that are
unintentional.  373 U.S. at 87 ("We now hold that the suppression by
the prosecution of evidence favorable to an accused upon request
violates due process where the evidence is material either to guilt
or to punishment, irrespective of the good faith or bad faith of the

---

[23/]    In Ferrara, 456 F.3d at 291, the court pointed out that a
defendant's misapprehension of the strength of the government's
case, standing alone, "cannot form the basis for a finding of
involuntariness."  Rather, "[i]t is only when the misapprehension
results from some particularly pernicious form of impermissible
conduct that due process concerns are implicated." Id. (citations
omitted).

prosecution."). Here, the nondisclosure of the 1:44 p.m. email was inadvertent, and the circumstances do not rise to the level of "egregiously impermissible conduct."[24]

Second, the outcome of a Brady v. Maryland analysis is dependent on a finding of materiality, and materiality focuses on the relationship of the withheld evidence to the outcome of the proceeding. See Bagley, 473 U.S. at 682 (evidence is material if there is a reasonable probability that the result of the proceeding

---

[24] The Court found it unnecessary to resolve defendant's claim that Det. Palchak's testimony at the preliminary hearing in this case was "materially false" (Order at 20 n. 8). See Napue v. Illinois, 360 U.S. 264 (1959). The government does not believe that this motion to reconsider requires further examination of that issue. In any event, it is clear from the record that the nondisclosure in this case was the result of simple inadvertence.

The government has consistently argued that the meaning defendant has extracted from the 1:44 p.m. email is not obvious from the face of that document (Government's Response to Brady claim in Defendant's Motion to Vacate, at 14-15). It is clear from the face of that document, however, that Det. Palchak did not directly agree to ingest methamphetamine with the defendant. Det. Palchak represented only that he had a little methamphetamine in his possession, but made no promise to share the drug with defendant or to accompany defendant to acquire more. Det. Palchak therefore accurately averred that he had not directly discussed with the defendant "meeting to actually ingest meth."

Moreover, Det. Palchak was testifying at a preliminary hearing, where the purpose of the proceeding was to establish probable cause that defendant had committed the charged offense, and not to prove defendant's guilt of that offense beyond a reasonable doubt. In that context, Det. Palchak had no reason to ascribe particular importance to the 1:44 p.m. email, and therefore no particular reason to notice its absence from the government's pre-indictment document production.

would have been different if the information had been disclosed). In assessing the voluntariness of a plea, however, Brady v. United States requires an assessment of "all of the relevant circumstances," including such factors as whether defendant would have faced a potentially more severe sentence if convicted after trial, 397 U.S. at 749; whether the court engaged in a full and proper Rule 11 colloquy at the time the plea was taken, see Campbell, 769 F.3d at 324; defendant's admission of guilt in connection with the plea, id.; and the assistance of counsel at the plea proceeding. Id.[25/]  This Court bypassed consideration of these factors, and linked its materiality determination only to an assessment of how much "probative force" the 1:44 p.m. email would have added to a potential methamphetamine addict defense (Order at 23-24).[26/]

In this case, the Court failed to consider, in particular, the significance of defendant's admission at the plea hearing that at

---

[25/]  Courts do not always make a clean distinction between Brady v. Maryland and Brady v. United States, even when purporting to employ the correct analysis. In Ferrara, 456 F.3d at 293-94, for example, the court acknowledged that Brady v. United States applied to a determination of the voluntariness of a plea; the court concluded that the standard for evaluating voluntariness under Brady v. United States "mirrored" the Brady v. Maryland "materiality" inquiry; but then actually employed an "objective approach" that considered a variety of factors that went beyond a strict Brady v. Maryland inquiry.

[26/]  As we discuss infra, moreover, the Court's assessment of the value of the 1:44 p.m. email was flawed because the Court did not examine the efficacy of a potential methamphetamine-addict defense.

30

the time he traveled into the District of Columbia, he did intend to have sex with the minor child Det. Palchak had described.  This admission goes a long way towards demonstrating the voluntariness of the plea.  See Mathur, 624 F.3d at 507 ("when a defendant chooses to admit his guilt, Brady [v. Maryland] concerns subside.").  Moreover, that admission was made during a plea colloquy the completeness of which defendant has never challenged.  see Campbell, 769 F.3d at 324.

Significantly, by accepting the government's plea, the defendant avoided a possible ten-year mandatory-minimum sentence (See Government's Supplemental Memorandum at 10 n. 7).  Instead, defendant pleaded guilty to an offense that carried no mandatory minimum, and obtained the benefit of a three-level reduction of the otherwise applicable Sentencing Guidelines base offense level on account of the early plea.  Ultimately, the defendant received a sentence of 25 months, but did not even serve the entirety of that term; this was about 1/5 of the mandatory sentence he would have received had he been convicted after a trial.  The Court's opinion says virtually nothing about the massive sentencing advantage attendant upon this plea.[27/]   See Brady v. United States, 397 U.S.

---

[27/]   Another important consideration buttresses the conclusion that the defendant's decision to forego a trial was voluntary.  Notably, given the nature of this offense, defendant would have faced public embarrassment had he submitted to a trial at which his conversation

at 749.

Even if the Court properly looked to <u>Brady v. Maryland</u> as the framework for determining prejudice (materiality), however, the Court erred in the application of that standard.  Relying on <u>Sanchez</u>, 50 F.3d at 1454, this Court concluded that where the defendant has pleaded guilty, the proper approach for assessing the materiality of undisclosed evidence under <u>Brady v. Maryland</u> turns on whether there is a reasonable probability that the defendant would have gone to trial had he known of the withheld evidence (Order at 21).  The Court then misapplied <u>Sanchez</u>.

The Court acknowledged that this was a "close[] case on the issue of prejudice," but concluded that Det. Palchak's "confirmation" in the 1:44 p.m. email "tip[ped] the scale" toward a reasonable probability that defendant "would have taken his chances at trial" had he known of that email (Order at 23-24).  In so holding, the Court explicitly rejected "[t]he government's denigration of the weight of the evidence and its persuasiveness at trial" as a means of assessing the likely impact of the 1:44 p.m. email on defendant's choice to plead or go to trial (Order at 22, n. 9).  <u>Sanchez</u>, however,

---

with Det. Palchak, the items entered on his "Bareback" profile, and the "PnP" lifestyle would all have been openly discussed.  Defendant was certainly sensitive to such disclosures; at his plea hearing, counsel made express reference to defendant's reluctance to reveal in open court the "explicit sexual details" of this offense (Plea Transcript at 14-15).

32

makes clear that the determination of whether a reasonable probability exists that a defendant would have opted for a trial is an <u>objective</u> inquiry which "centers on '<u>the likely persuasiveness</u> of the withheld information.'" <u>Sanchez</u>, 50 F.3d at 1454 (citing <u>Miller v. Angliker</u>, 848 F.2d 1312, 1322 (2d Cir. 1988)).

Importantly, evidence that defendant had a methamphetamine addiction and was seeking a source for the drug was not a complete defense to the charged sex offense; indeed, such evidence may well have complemented the prosecution.  As the government pointed out (Supplemental Memorandum at 9 n. 6), in the "PnP" culture (of which "gay hook-up" cites visited by defendant, such as "Bareback," are a part), sex – including group sex -- accompanies methamphetamine use.[28/]  Moreover, there was persuasive evidence that defendant was at least as interested in sex as he was in methamphetamine: 1) his "Bareback" name was "verspointnowDC," the first segment of which ("vers") is by defendant's own admission a reference to his sexual proclivities (see Affidavit ¶ 7); and 2) defendant's "Bareback" profile – which defendant had reactivated the very night he "met" Det. Palchak on line – contains numerous references to the sexual

---

[28/]   The first line of the "Wikipedia" entry on "Party and Play" (cited by defendant in his Motion to Vacate, at 7), explains that "party and play (PNP and PnP) is a phenomenon and subculture of recreational drug users <u>who engage in sexual activities with one another, either one-on-one or in groups</u>."  www.wikipedia.org/wiki/Party-and-play (emphasis supplied).

activities in which defendant was willing to engage.[29] And, during his online conversation with Det. Palchak, defendant asked to see pictures of the "perv boi" whom Det. Palchak had described, and upon receiving a picture, asked if Det. Palchak had anything "nastier." On this evidence, as a whole, there would have been a substantial risk that upon learning of defendant's methamphetamine use, the jury would have concluded that defendant traveled into the District of Columbia looking to have group sex with Det. Palchak and the minor "perv boi" as part of a wild night of "PnP" debauchery, rather than in a single-minded quest to obtain the drug.  The slim chance that a methamphetamine defense – even if supported by the 1:44 p.m. email -- would have persuaded a jury of defendant's complete innocence of the charged sex offense alone merits rejection of defendant's effort to vacate his plea.

     Finally, as the government also pointed out in its Supplemental

---

[29] Defendant has acknowledged that he "tailor[ed] his screen names and online profiles to attract other meth users" (Petition at 9). At oral argument, defense counsel pointed out that the various categories of information reflected on the profile reflect items on a "drop-down" menu that individuals can select when filling out their profile.  It was unclear whether counsel was suggesting that defendant did not select the particular items that appear on his profile page.  However, at a minimum, defendant appears to have answered "yes" to the items indicating "take loads anal," "take loads oral," "give loads anal," and "give loads oral," all of which are blatant references to sexual activities.  He also describes his penis as "average/cut," which would be irrelevant to someone merely seeking a partner with whom to ingest methamphetamine.

Memorandum (at 10 n. 7), the methamphetamine addict defense had not been successfully mounted at the time defendant was called upon to decide whether to risk a trial or take a plea.  In short, "[d]efendant had to decide whether to go to trial on the information available to him and his attorneys in April 2011, not based on what happened in another case before another judge eight months later" (id.).  In sum, even if defendant had known of the 1:44 p.m. email at the time he made a decision about the government's plea offer, he would have had to consider the viability of going to trial with a defense that had not yet been successfully posited; that bore the risk of corroborating, rather than detracting from, the government's case; that would have resulted in public disclosure of very private personal proclivities; and that bore the risk of a substantial prison sentence upon conviction.  Viewed objectively, there is no reasonable probability that a defendant facing these realities would have rejected the government's generous plea offer.

**Wherefore,** in conclusion, the government respectfully requests that this Court reconsider its October 25, 2013 Order, and enter an order denying defendant's motion under 28 U.S.C. § 2255 to vacate his conviction.

Respectfully submitted,

 /s/ Ronald C. Machen Jr.
RONALD C. MACHEN JR., D.C. Bar No. 447889
United States Attorney

35

_/s/ Leslie Ann Gerardo_
LESLIE ANN GERARDO, D.C. Bar No. 419823
Chief, Special Proceedings Division
(202) 252-6603; Leslie.Gerardo@USDoJ.Gov

_/s/ Barry Wiegand_
BARRY WIEGAND, D.C. Bar No. 424288
Assistant United States Attorney
Special Proceedings Division
555 Fourth Street, N.W.,
Washington, D.C. 20530
(202)252-7723;William.B.Wiegand@usdoj.Gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of the foregoing to be served by filing this through the Court's ECF system on or before the 22nd day of November 2013.

_/s/ Barry Wiegand_
Barry Wiegand

36